Filed 7/28/16  Brian U. v. Superior Court CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| BRIAN U., | F073653 |
| Petitioner, | |
| v. | (Super. Ct. No. 516888) |
| THE SUPERIOR COURT OF STANISLAUS COUNTY, | **OPINION** |
| Respondent; | |
| STANISLAUS COUNTY COMMUNITY SERVICES AGENCY, | |
| Real Party in Interest. | |

### THE COURT[*]

ORIGINAL PROCEEDING; petition for extraordinary writ review.  Ann Q. Ameral, Judge.

Nadine Salim, under appointment by the Court of Appeal, for Petitioner.

No appearance for Respondent.

No appearance for Real Party in Interest.

-ooOoo-

---

[*]      Before Levy, Acting P.J., Kane, J. and Smith, J.

Brian U. (father) seeks extraordinary writ relief from the juvenile court's dispositional orders denying him reunification services under Welfare and Institutions Code section 361.5, subdivision (b)(13)[1] and setting a section 366.26 hearing as to his now two-year-old daughter, Emersyn. He contends the court erred in applying the denial of services statute to his unique circumstances. He also contends the court erred in finding that the Stanislaus County Community Services Agency (agency) used due diligence in identifying a possible relative placement. We deny the petition.

### PROCEDURAL AND FACTUAL SUMMARY

This case marks the second dependency proceeding involving Emersyn. In November 2013, then two-month-old Emersyn was taken into protective custody because her maternal grandmother could no longer care for her. Emersyn's mother, Taylor,[2] was using methamphetamine and left Emersyn in the grandmother's care. The juvenile court exercised its jurisdiction over Emersyn and granted Taylor and father reunification services. In June 2014, the court released Emersyn to Taylor's custody with family maintenance services. In January 2015, the court released Emersyn to father's custody with family maintenance services and in July 2015 issued joint custody orders to Taylor and father and dismissed the dependency.

These dependency proceedings were initiated in February 2016 after the agency responded to a report that then two-year-old Emersyn was wandering around her apartment complex unsupervised. She was seen descending the stairs alone from the second floor apartment where she and Taylor lived. She was also seen going to other apartments asking tenants for food. In addition, there was concern she could access the nearby swimming pool even though it was fenced in.

---

[1]     Statutory references are to the Welfare and Institutions Code.

[2]     Taylor did not file a writ petition.

2

Taylor told the investigating social worker that she left Emersyn alone while she went to take out the trash but that she locked the deadbolt before leaving. She said that Emersyn knew how to stand on things and unlock the door. Father said he was at work when the incident occurred. Both parents stated that if tested, they would test positive for methamphetamine and marijuana. The social worker informed them that someone would need to care for Emersyn while the agency investigated. They suggested Emersyn's previous foster parents.

The agency filed an original dependency petition alleging under section 300, subdivision (b)(1) (failure to protect) that father and Taylor failed to supervise Emersyn, resulting in her wandering outside the apartment unattended on multiple occasions, including one occasion when an employee from Pep Boys, located several blocks from the apartment complex, returned her to the apartment manager. Additionally, apartment security video recorded Taylor putting Emersyn in the apartment, shutting the door and leaving, and then returning 10 to 15 minutes later. Emersyn was also found unescorted, walking along the upper floor balcony. The petition further alleged that Taylor and father received court-ordered substance abuse treatment in Emersyn's prior dependency case and had multiple arrests for substance abuse related charges. In addition, father was convicted of possession of a controlled substance in 2006 and served a sixteen-month prison term.

Emersyn's foster parents notified the agency that Emersyn smelled faintly of methamphetamine when she arrived at their home. She also had sores or bites on her torso, burn marks or sores on her hand, a red rash on her lower back, under her nose and on her cheek and two sores on her foot.

The juvenile court ordered Emersyn detained and ordered that she undergo drug testing by hair follicle analysis. The court continued the matter to March 2016 for a hearing on jurisdiction and disposition (combined hearing) and the agency referred father and Taylor for individual counseling, parenting classes and a substance abuse assessment.

Prior to the combined hearing, the agency received the results of Emersyn's hair follicle analysis that was positive for methamphetamine. The agency filed a first amended petition adding an allegation that father and Taylor exposed Emersyn to their substance abuse.

In its report for the combined hearing, the agency recommended the juvenile court adjudge Emersyn a dependent child and deny father and Taylor reunification services under section 361.5, subdivision (b)(13) because of their "extensive, abusive, and chronic use of drugs or alcohol" and resistance to court-ordered treatment. The agency reported that father had a 27-year history of drug use and numerous drug-related arrests. From May to July 2013, he participated in residential drug treatment but relapsed and was actively using drugs when Emersyn was taken into protective custody in November 2013. In December 2013, he entered court-ordered drug treatment and graduated from the program in February 2014. He relapsed the next day. He was promptly readmitted and in April 2014, he graduated from the program and began outpatient treatment that he completed the following September. In January 2015, the juvenile court returned Emersyn to father's custody under family maintenance and in July 2015 dismissed its dependency jurisdiction. Approximately three months later, father and Taylor relapsed. When asked what caused his relapse, father said he and Taylor talked and joked about using methamphetamine and mistakenly believed they could use it one more time. They began using it every few days but quickly progressed to daily use. In October 2015, his mother was hit by a car and died. He found it difficult to grieve and increased his drug use.

Taylor also had a long history of drug use and resisting treatment that the agency detailed in its report.

The agency also reported that father made minimal efforts to engage in the services offered to him after the detention hearing. He completed a substance abuse assessment but continued to use methamphetamine. Taylor had not engaged in any

4

services, had not visited Emersyn and was arrested in March 2016 with a syringe full of methamphetamine in her possession.

The agency included in its report a list of relatives who were possible placement candidates. The list, designated as "Attachment J," was drawn from multiple state and county databases, internet search engines and social networking sites. On March 8, 2016, social worker Rebecca Blacksten, the placement specialist, mailed letters to 15 relatives listed; ten maternal relatives, including the maternal grandmother, and five paternal relatives. Blacksten included an informational pamphlet entitled "Important Information for Relatives of a Child in Foster Care" along with each letter. Only two of the relatives, including the maternal grandmother, had valid telephone numbers. None of the relatives had applied for placement.

In April 2016, the juvenile court conducted a contested hearing. In an addendum report, the agency informed the court that father was participating in an intensive outpatient program and residing at a clean and sober facility, and that Taylor visited Emersyn once in late March 2016.

Father testified he was participating in intensive outpatient treatment and last tested positive for drugs on March 15, 2016. He acknowledged completing residential drug treatment three times and subsequently relapsing each time. He abstained from drug use from April 2014 to October 2015 and then relapsed after finding out that his father had cancer and congestive heart failure and after his mother was hit by a car and killed. He did not seek out any support before he relapsed. He was overwhelmed with grief and did not know how to cope with his situation other than to resort to drugs. On redirect, however, he testified he relapsed on alcohol before knowing his father was sick and used methamphetamine approximately three times before his mother died.

Father knew that Taylor was using methamphetamine while caring for Emersyn but believed it was Taylor's responsibility to take care of Emersyn while he worked. He never asked Taylor if she used methamphetamine in Emersyn's presence. After

5

conducting some research, he believed that Emersyn tested positive for methamphetamine through skin-to-skin contact with him.

Father also testified that his "little sister's mother" and his Aunt Kim would take custody of Emersyn, and that his stepmother had applied for custody. His aunt needed more information to apply. He said he and Taylor were no longer in a relationship and had not been since December 2015.

Taylor's attorney made an offer of proof that Taylor was participating in services in jail and that her visit with Emersyn in March 2016 went very well. The court accepted the offer of proof.

Social worker Beth Morrison was questioned by father's attorney about Attachment J. She did not know if Ms. Blacksten made any further attempts to contact the relatives listed after sending out the letters. However, she spoke to Blacksten during a break and testified that Blacksten followed up with the maternal grandmother after Emersyn was removed. She did not know if Blacksten attempted to obtain valid telephone numbers for the other relatives.

The juvenile court sustained the first amended petition, denied father and Taylor reunification services under section 361.5, subdivision (b)(13) and set a section 366.26 hearing. The court also found that the social worker exercised due diligence in attempting to identify, locate and notify Emersyn's relatives.

This petition ensued.

**DISCUSSION**

Father contends the juvenile court erred in denying him reunification services under section 361.5, subdivision (b)(13) (the statute) that permits the denial of services to a parent when the juvenile court finds by clear and convincing evidence that the parent has a history of extensive, abusive, and chronic use of drugs or alcohol and has resisted prior court-ordered treatment for this problem during a three-year period immediately prior to the filing of the petition that brought the child to the court's attention, or has

6

failed or refused to comply with a program of drug or alcohol treatment on at least two prior occasions, even though the programs identified were available and accessible.

Father does not dispute that the statute applies to him insofar as he has the requisite history of drug use. Nor does he dispute that a relapse may constitute resistance to treatment under the statute or that he relapsed following the completion of court-ordered drug treatment on multiple occasions, most recently within three years of the petition filed in this case. Nevertheless, he invites this court to consider his relapse in essence an excusable reaction to a traumatic experience (i.e., his father's severe illness and his mother's sudden death) rather than resistance to treatment.

Whether a relapse constitutes "resistance to treatment" under the statute depends on how it evolves rather than on its impetus. The type of relapse that demonstrates resistance is one that results in the resumption of regular drug use after a period of sobriety. (*Laura B. v. Superior Court* (1998) 68 Cal.App.4th 776, 780.) It is not a mere "setback" or "brief relapse." (*Ibid.*) Consequently, a person could suffer a brief relapse following a traumatic experience and not be considered resistant to treatment if that person did not resume regular drug use. However, that is not what father did. When he relapsed during that period of time surrounding his father's illness and mother's death, he resumed regular drug use. He said he began using methamphetamine every few days and was using it daily when the agency intervened. His relapse had evolved into regular drug use and constituted resistance to treatment under the statute. Therefore, the juvenile court did not err in applying it to him.

Father asserts nevertheless that Emersyn was very attached to him and that providing him reunification services would serve her best interest. Indeed, the juvenile court could have ordered reunification services for father despite having found a basis to deny him services under the statute. However, in order to do so, the court had to find by clear and convincing evidence that it would be in Emersyn's best interest. (§ 361.5, subd. (c).) Father testified that Emersyn greeted him with a hug when she saw him,

7

referred to him as "Daddy" and asked when she could go home with him. However, that evidence did not compel the court to order services in father's case and, under the circumstances, we find no abuse of discretion in the court's decision.

Father further contends the agency failed to comply with its investigative duty under section 309, subdivision (e)(1) to locate relatives for possible placement. We disagree.

When a child is removed from parental custody, the social worker "shall use due diligence" (§ 309, subd. (e)(3); Cal. Rules of Court, rule 5.637(a)) "to identify and locate all grandparents, … and other adult relatives of the child, … including any other adult relatives suggested by the parents." (§ 309, subd. (e)(1).) The social worker shall provide located relatives with written notice, and oral notice when appropriate, of the child's removal (§ 309, subd. (e)(1)(A)) and "[a]n explanation of the various options to participate in the care and placement of the child and support for the child's family, including any options that may be lost by failing to respond." (§ 309, subd. (e)(1)(B); Cal. Rules of Court, rule 5.534(f)(3).)

On appeal, father bears the burden of showing that substantial evidence does not support the juvenile court's finding the social worker exercised due diligence in identifying, locating and notifying Emersyn's relatives for placement. (*Winograd v. American Broadcasting Co*. (1998) 68 Cal.App.4th 624, 632.) Father failed to satisfy his burden.

Father contends the agency's investigation was inadequate because the social worker made no attempt to find telephone numbers for all of the relatives listed in Attachment J. He seems to infer that the social worker did not exercise due diligence because she did not contact the relatives by telephone. Father's argument, however, is baseless. Section 309, subdivision (e)(1) requires "written notification." Blacksten notified the relatives listed by letter and there is no evidence that they did not receive the letter. Further, the statute does *not* require "oral notification" unless it is appropriate.

8

Here, Blacksten also spoke to Emersyn's maternal grandmother, which was appropriate since she had cared for Emersyn before and was the most likely person to assume custody of her.

We conclude substantial evidence supports the juvenile court's due diligence finding and deny the petition.

## DISPOSITION

The petition for extraordinary writ is denied. This opinion is final forthwith as to this court.